RECEIVED IN
COURT OF CRIMINAL APPEALS

December 29, 2014

ABEL ACOSTA, CLERK

NO. _____

# IN THE COURT OF CRIMINAL APPEALS

## FOR THE STATE OF TEXAS

| | | |
|---|---|---|
| **WILLIAM DRIVER** | * | **APPELLANT** |
| | * | |
| **V.** | * | |
| | * | |
| **STATE OF TEXAS** | * | **APPELLEE** |

Trial Court Cause No.   1396922
In The 182nd District Court
Of Harris County, Texas
Hon. Frank Price, Judge Presiding

First Court of Appeals Cause No. 01-14-00375-CR

## PETITION FOR DISCRETIONARY REVIEW

**Clay S. Conrad**
**State Bar No. 00795301**
**Paul C. Looney**
**State Bar No. 12555900**

**LOONEY & CONRAD, P.C.**
11767 Katy Fwy.,   Suite 740
Houston, Texas   77079
Tel. No. (281) 597-8818
Fax No. (281) 597-8284
COUNSEL FOR APPELLANT

# TABLE OF CONTENTS

                                                                    **Page**

Table of Contents ............................................................... i

Index of Authorities ............................................................ iii

Grounds for Review ........................................................... v

Statement Regarding Oral Argument................................... vi

Statement of the Case........................................................ vii

Statement of Procedural History ...................................... vii

Summary of Argument....................................................... viii

*Grounds For Review Number One* .........................................2
IS PRE-TRIAL HABEAS CORPUS RELIEF AVAILABLE TO
CHALLENGE AN INDICTMENT ISSUED BY A GRAND
JURY PURSUANT TO PROCEDURES THAT FAIL TO
PROVIDE DUE PROCESS AND DUE COURSE OF LAW?

    A.    THE RIGHT TO AN UNBIASED GRAND JURY IS
          PARAMOUNT ...................................................................2

    B.    TEXAS COURTS HAVE A DUTY, TO PROTECT A
          DEFENDANT'S RIGHTS TO DUE PROCESS AND DUE
          COURSE OF LAW BEFORE THE GRAND JURY...................3

    C.    THIS CASE MUST BE REMANDED FOR CONSIDERATION
          ON ITS MERITS ...............................................................6

Conclusion and Prayer for Relief................................................10

Certificate of Service ................................................................12

Appendix
1. Panel Opinion, First Court of Appeals, November 20, 2014
*William Driver v. The State of Texas*
Cause No. 01-14-00375-CR ....................................................13

2. Testimony
Dr. Bryan Sweeney
*State of Texas v. Driver*
Harris County District Court Cause No. 1396922 ....................14

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Abney v. United States*,
    431 U.S. 651 (1977)                                                      3

*Carter v. State*,
    691 S.W.2d 112 (Tex. App. Fort Worth 1985)                               8

*Costello v. United States*,
    350 U.S. 359 (1956)                                                    ix, 2

*Ex Parte Robinson*,
    641 S.W.2d 552 (Tex.Cr.App.1982)                                      3, 4, 5

*Maretick v. Jarrett*,
    204 Ariz. 194, 62 P.3d 120 (2003)                                        9

*Peters v. Kiff*,
    407 U.S. 493 (1972)                                                    2, 6

*United States v. MacDonald*,
    435 U.S. 850 (1978)                                                    ix, 5

*Whittington, v. State*,
    680 S.W.2d 505 (Tex. App.—Tyler 1984, pet. ref'd)                        2


**STATUTES AND CONSTITUTIONAL PROVISIONS**                                   **PAGE**

Art. 1, Sec. 10, TEX. CONST                                                  3, 4

U.S. CONST, amend. V                                                         3

US. CONST, amend XIV                                                         3

Texas Code of Criminal Procedure Art. 19.35                                  8

Texas Code of Criminal Procedure Art. 20.05         8

Texas Code of Criminal Procedure Art. 20.06         8

Tex.R.App.P. 68.2         viii

Tex.R.App.P. 70.1         1

**OTHER SOURCES**         **PAGE**

James Pinkerton, "Bulletproof, Part 3: Hard to Charge",
    *Houston Chronicle*, December 1, 2013,
        (http://www.houstonchronicle.com/local/investigations/item/Bulletproof-Part-3-
        Hard-to-charge-24421.php)         7

Juan A. Lozano, "Harris County Grand Jury Shooting Simulator Stirs Debate",
    WFAA Channel 8, May 5, 2014
        (http://www.wfaa.com/news/texas-news/Texas-grand-jury-shooting-simulator-
        stirs-debate-257971791.html)         7

Ed Krayewski, "Houston Grand Jurors Subjected to Shooting Simulator to Prepare for
Police Shooting Cases,"
    Reason, May 5, 2014
        (http://reason.com/blog/2014/05/05/houston-grand-jurors-subjected-to-shooti)      7

"Simulator trains Harris County Grand Jurors on Self Defense Scenarios",
    KHOU, July 26, 2013
        (http://www.khou.com/story/local/2014/08/06/12103674/)         7

Mark Hansen, "Ready, Aim – Indict!,"
    ABA Journal, Oct 1, 2007
        (http://www.abajournal.com/magazine/article/ready_aim_indict/)         7

## *GROUNDS FOR REVIEW NUMBER ONE:*

IS PRE-TRIAL HABEAS CORPUS RELIEF AVAILABLE TO CHALLENGE AN INDICTMENT ISSUED BY A GRAND JURY PURSUANT TO PROCEDURES THAT FAIL TO PROVIDE DUE PROCESS AND DUE COURSE OF LAW?

# STATEMENT REGARDING ORAL ARGUMENT

In the event Petitioner's petition for discretionary review is granted by this Honorable Court, Petitioner requests oral argument. The Petitioner believes oral argument would assist this Honorable Court in resolving the questions involved herein, as the issues in this case, while highlighted by the unique facts of this case, have frequently recurred, and in fact appear to be ongoing in several parts of the State.

## STATEMENT OF THE CASE

On August 5, 2013, the Appellant was indicted in Cause No. 1396922, 182nd District Court, Harris County, Texas. C.R., 4. On January 29, 2014, the Defendant filed a *Motion to Quash Indictment*. C.R., 5. On April 21, 2014, Judge Frank Price, sitting by assignment, denied the Defendant's *Motion to Quash Indictment* in a written order, and included findings of fact and conclusions of law. C.R. 38. On April 22, 2014, the Defendant filed his *Motion for Writ of Habeas Corpus and Motion to Stay*. C.R. 43. The writ was denied on April 23, 2014, adopting the findings of fact and conclusions of law issued in response to the *Motion to Quash Indictment*. C.R. 47. *Notice of Appeal* was timely filed. C.R. 51.

The First Court of Appeals, in Cause No. 01-14-00375-CR, denied relief on November 20, 2014, holding that pre-trial habeas corpus relief was not available under the facts of this case. This Petition follows.

## STATEMENT OF PROCEDURAL HISTORY

The First Court of Appeals denied relief in an unpublished opinion on November 20, 2014. (See Appendix A). This Petition follows pursuant to Tex.R.App.P. 68.2.

vii

## SUMMARY OF ARGUMENT

The question before this Honorable Court is whether pre-trial habeas corpus relief is available in Texas to dismiss an indictment, when the indictment has been issued by a Grand Jury that has been subjected to "training" and "orientation" procedures that create, at the absolute minimum, the likelihood or the appearance of bias. An unbiased grand jury is fundamental to due process. See *Costello v. United States*, 350 U.S. 359, 363 (1956). Because the Petitioner has a "right not to be tried [on an indictment whose issuance violates due process and due course of law] which must be upheld prior to trial if it is to be enjoyed at all," *U.S. v. MacDonald*, 435 U.S. 850, 861 (1978), this Honorable Court is bound to remand this cause back to the intermediate Court for consideration on the merits.

NO. _____

# IN THE COURT OF CRIMINAL APPEALS
## FOR THE STATE OF TEXAS

| | | |
|---|---|---|
| **WILLIAM DRIVER** | * | **APPELLANT** |
| | * | |
| **V.** | * | |
| | * | |
| **STATE OF TEXAS** | * | **APPELLEE** |

Trial Court Cause No.   1396922
In The 182nd District Court
Of Harris County, Texas
Hon. Frank Price, Judge Presiding

First Court of Appeals Cause No. 01-14-00375-CR

## PETITION FOR DISCRETIONARY REVIEW

**TO THE HONORABLE JUDGES OF THE TEXAS COURT OF CRIMINAL APPEALS:**

Comes now WILLIAM DRIVER, by and through his counsel on appeal, and files this his *Petition for Discretionary Review* pursuant to Tex.R.App.P. 70.1. In support of his prayer for review, he would respectfully show the Court the following:

1

## GROUNDS FOR REVIEW NUMBER ONE

IS PRE-TRIAL HABEAS CORPUS RELIEF AVAILABLE TO CHALLENGE AN INDICTMENT ISSUED BY A GRAND JURY PURSUANT TO PROCEDURES THAT FAIL TO PROVIDE DUE PROCESS AND DUE COURSE OF LAW?

## ARGUMENT AND AUTHORITIES

### A. THE RIGHT TO AN UNBIASED GRAND JURY IS PARAMOUNT

There are few more fundamental rights in Anglo-American jurisprudence than the right not to be tried until, and unless, an indictment has been issued by a properly constituted, fair and neutral Grand Jury. An unbiased grand jury is fundamental to due process. *See Costello v. United States,* 350 U.S. 359, 363 (1956). As the Tyler Court of Appeals has noted, "[t]he integrity and independence of our grand jury system must be protected from unwarranted intrusion by way of prosecutorial misconduct as well as improper influences exerted upon the grand jurors which is [SIC] calculated to evoke grand jury action based on prejudice and bias alone." *Whittington, v. State,* 680 S.W.2d 505, 510 (Tex. App.—Tyler 1984, pet. ref'd). "Even where there is no showing of actual bias in the tribunal…due process is denied by circumstances that create the likelihood or the appearance of bias." *Peters v. Kiff,* 407 U.S. 493, 502 (1972).

2

## B. TEXAS COURTS HAVE A DUTY, TO PROTECT A DEFENDANT'S RIGHTS TO DUE PROCESS AND DUE COURSE OF LAW BEFORE THE GRAND JURY

The right not to be tried in the absence of a properly issued indictment is a meaningless guarantee of form without substance if not capable of being enforced pre-trial. This is similar to a pre-trial writ of Habeas Corpus in the double jeopardy context, in which trial itself is barred by fundamental Constitutional principles. In *Ex Parte Robinson*, 641 S.W.2d 552 (Tex.Cr.App.1982), relying on *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), this Court held "[w]e are compelled to hold that there is a Fifth Amendment right not to be exposed to double jeopardy, and that it must be reviewable before that exposure occurs." *Id.* at 555; U.S. CONST, amends. V and XIV; Art. 1, sec. 10, TEX. CONST. This Court then explained that a pretrial writ under Chapter 11, V.A.C.C.P. was the mechanism to be utilized in seeking relief from exposure to double jeopardy.

The right not to be tried in the absence of a properly issued grand jury indictment is of no less import than the right to be free from Double Jeopardy. Article I, Sec. 10 of the Texas Constitution states that "… no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury, except in cases in which the punishment is by fine or imprisonment, otherwise than in the penitentiary…" The Grand Jury guarantee protects a defendant from being put in

3

jeopardy on a felony charge without the State first obtaining a lawfully acquired indictment. Absent a lawfully acquired indictment, the State cannot force a Defendant to endure "the personal strain, public embarrassment, and expense of a criminal trial…" *Ex Parte Robinson*, 641 S.W.2d 552, 553 (Tex.Crim.App. 1982).

An indictment issued by a grand jury that has been tampered with or manipulated nullifies the due process and due course of law guarantees of Article I, Sec. 10 and makes of them a meaningless formality, not the fundamental Constitutional right Texas law intends. This is not a situation in which the evidence put before the Grand Jury is at issue in determining the validity of the indictment. What is at issue here in are the overly suggestive, manipulative, and unfair procedures used to "train" and "orient" the grand jurors, procedures that expert testimony shows have a very high tendency to render the resultant grand jury biased and partial. But the principles are best considered by asking whether this Honorable Court would allow grand jury manipulations in extreme circumstances. If this Honorable Court would halt extreme proceedings, then it is a question of setting the standards for when proceedings must be terminated.

Consider, for example, a situation in which evidence showed that Grand Jurors were paid per indictment issued. Would any Court hold that such a system could not be questioned before trial? Or should it come to light that the Grand Jurors had

4

been threatened with prosecution should they fail to issue a true bill? Would any Court in the State of Texas say that a writ of Habeas Corpus did not lie to prevent the injustice of such an indictment going to trial? Would such Grand Jury procedures, wholly bereft of due process, justify forcing a Defendant to endure "the personal strain, public embarrassment, and expense of a criminal trial..." *Robinson, supra* at 553.

The Court below erred in analogizing this case *to U.S. v. MacDonald*, 435 U.S. 850 (1978), a case which found that speedy trial rights could not be enforced pre-trial through habeas litigation. The *MacDonald* opinion's language clearly embraces the present situation:

> "Unlike the protection afforded by the Double Jeopardy Clause, the Speedy Trial Clause does not, either on its face or according to the decisions of this Court, encompass a 'right not to be tried' which must be upheld prior to trial if it is to be enjoyed at all. It is the delay before trial, not the trial itself, that offends against the constitutional guarantee of a speedy trial."

*MacDonald* at 186. The constitutional infirmity inherent in this matter is the threat of a trial on the authority of a constitutionally invalid indictment, issued through procedures that violate due process and due course of law. The constitutional protections provided by the Constitutional requirement of a properly issued indictment are eviscerated if such protections can only be enforced post-trial.

Where forcing a Defendant to proceed to trial and then (if unsuccessful) to

appeal violates fundamental Constitutional rights, Texas appellate courts are not only empowered to intervene, but are duty-bound to do so. Due process and due course of law are violated when circumstances exist that clearly create (at a bare minimum) the likelihood or the appearance of a biased grand jury. *Peters v. Kiff, supra.* The Court below erred in holding that it was not authorized to intervene.

## C. THIS CASE MUST BE REMANDED FOR CONSIDERATION ON ITS MERITS

The Court below never reached the merits of the Petitioner's complaint. While the issues involved in this case are novel, they are both timely and fundamental and should be taken up by the Court below. Accordingly, this case should be remanded for full consideration on the merits.

The issue here in whether grand jury "orientation and training" procedures that have a high likelihood – in fact, a near certainty – of biasing the grand jurors in certain categories of cases violate the Constitutional guarantees of due process and due course of law, at least in those categories of cases in which such bias is most likely. This is not a challenge to the evidence which was placed before the grand jury, but a challenge to the constitutionality of the unfair procedures involved. This is a challenge to the unchecked authority of the State in manipulating and controlling grand jury "orientation and training."

The Grand Jury in this case was "trained" through the use of a "firearms training simulator" (FATS). R.R. 8. The use of these simulators to "train" grand jurors is controversial, and has been widely discussed in the media. [1] The mechanics of the simulator are not controverted. The "trainee" is given a modified firearm. They watch a scenario on a video screen in which a potential for violence develops. They must decide when and if to shoot. There are twelve scenarios: eight of them explicitly involve putting the trainee in the position of a police officer, and four are silent as to the role of the trainee. See R.R., 48-51, State's Exhibit 1.

The primary market for these devices is police officer training. R.R. 25. The simulations are not modified for grand jury usage. R.R. 27, 74. The trainees are "debriefed" after the simulation by a certified peace officer. R.R. 73, 74-76. The State of Texas has never had any psychologists or other qualified experts examine

---

1 See for a few examples, James Pinkerton, "Bulletproof, Part 3: Hard to Charge", *Houston Chronicle*, December 1, 2013 (http://www.houstonchronicle.com/local/investigations/item/Bulletproof-Part-3-Hard-to-charge-24421.php); Juan A. Lozano, "Harris County Grand Jury Shooting Simulator Stirs Debate", WFAA Channel 8, May 5, 2014 (http://www.wfaa.com/news/texas-news/Texas-grand-jury-shooting-simulator-stirs-debate-257971791.html); Ed Krayewski, "Houston Grand Jurors Subjected to Shooting Simulator to Prepare for Police Shooting Cases", Reason, May 5, 2014 (http://reason.com/blog/2014/05/05/houston-grand-jurors-subjected-to-shooti); "Simulator trains Harris County Grand Jurors on Self Defense Scenarios", KHOU, July 26, 2013 (http://www.khou.com/story/local/2014/08/06/12103674/), Mark Hansen, "Ready, Aim – Indict!", ABA Journal, Oct 1, 2007 (http://www.abajournal.com/magazine/article/ready_aim_indict/).

what effect these simulators may have on grand jurors. R.R. 67.

This is not a case involving merely "the State's general orientation to the grand jury on general areas of the law prior to presentment of cases to the grand jury." *Carter v. State*, 691 S.W.2d 112, 116 (Tex. App. Fort Worth 1985). It cannot be over-emphasized that the simulator employed herein is an experiential, visceral training device, not a didactic learning tool. It was not designed with grand juror training in mind – it is primarily used for training police officers. R.R. 25, 27, 74.

There must be some due process and due course of law limitations placed on the State's discretion in the orientation and training of grand jurors. It is important to note that grand jury "orientation and training" programs exist entirely outside of the procedures authorized by the Texas Code of Criminal Procedures. The Texas legislature has never seen a need for such programs: in fact, Chapters 19 and 20 of the Texas Code of Criminal Procedure do not mention grand jury orientation and training. Art. 19.35 provides the court shall instruct the grand jury as to their duty. Art. 20.05 and 20.06 provides that the grand jury may request advice from the attorney representing the State or from the Court, respectively; the law does not authorize the State to create arbitrary and unfair "orientation and training" programs.

We are thus presented with extra-legal procedures that are invoked to address a non-existent need, which have a high likelihood of biasing some or all of the grand

8

jurors in certain categories of cases, and which the State of Texas has never even investigated to determine whether they may be unfairly influencing grand jury proceedings. The grand jury system is not infinitely malleable, and it is not the private property of the District Attorney's offices throughout the State for them to do with as they please. "Prosecutors bear a particularly weighty duty not to influence the jury because the defendant has no representative to watch out for his interests before the grand jury." *Maretick v. Jarrett*, 204 Ariz. 194, 196, 62 P.3d 120, 122 (2003) Any "orientation and training" programs must remain unquestionably neutral to comply with due process and due course of law: programs designed and intended with the purpose of training police officers fall far short of that standard.

Somewhat surprisingly, these are issues this Honorable Court has never had to address in a written opinion. Clearly, due process and due course of law place some limits on the discretion of the State to "orient and train" grand jurors, using methods and procedures not authorized by the Legislature. The parameters of those limits have yet to be considered by this Honorable Court. The time for doing so is now.

This case squarely presents these important issues, and the Court of Appeals has not considered the merits.[2] That is a pre-requisite for this Honorable Court to

---

2       The first step in considering the merits should be to remand this case back to the trial court, for complete findings of fact and conclusions of law, addressing the testimony of Dr. Bryan Sweeney.   The losing party on a motion to suppress is, on request, entitled

9

address the merits of the case. Accordingly, the Petitioner requests that this Honorable Court remand this case back to the Court of Appeals for consideration on the merits.

## CONCLUSION AND PRAYER FOR RELIEF

The Panel Opinion of November 20, 2014 was erroneous in that it failed to find that pre-trial habeas relief was available to challenge an indictment issued by a grand jury that had been "trained and oriented" in such a manner as to deprive the Petitioner of due process and due course of law. Because habeas relief is available in such a situation, this case should be REMANDED to the Court below for consideration on the merits.

By: _____

CLAY S. CONRAD
State Bar No. 00795301
PAUL C. LOONEY
State Bar No. 12555900
**LOONEY & CONRAD, P.C.**
11767 Katy Freeway, Suite 740
Houston, Texas 77079
Ph. No. (281) 597-8818

---

to "essential findings" of fact that are "adequate to provide an appellate court with a basis upon which to review the trial court's application of the law to the facts." See *State v. Elias*, 339 S.W.3d 667, 674 (Tex.Crim.App. 2011) (quoting *State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006)) The Petitioner filed a *Motion to Remand to Trial Court for Complete Findings of Fact and Conclusions of Law* on August 13, 2014, which has never been ruled on.

10

Fax No. (281) 597-8284
Attorneys for Appellant

## Certificate of Service

I certify that on December 19, 2014 a true and correct copy of the above and foregoing *Appellant's Petition for Discretionary Review* was properly mailed on this day to:

Harris County District Attorney's Office
Appellate Division
1201 Franklin
Houston, TX 77002

State Prosecuting Attorney's Office
P.O. Box 13046
Austin, Texas 78711

_____
Clay S. Conrad

APPENDIX 1:

**Panel Opinion,** *Driver v. State*

**First Court of Appeals No. 01-14-00375-CR**
**Released November 20, 2014**

Opinion issued November 20, 2014



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00375-CR

———————————

## EX PARTE WILLIAM D. DRIVER, Appellant

———————————

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1396922**

———————————

## MEMORANDUM OPINION

Appellant William Driver appeals the trial court's denial of his request for a pretrial writ of habeas corpus. He challenges his indictment on the basis that a firearms-training simulation offered as part of the grand jury's orientation caused the grand jury returning the indictment to be biased against him. We conclude that

this complaint is not a proper basis for pretrial habeas corpus relief, and accordingly we affirm the ruling of the trial court.

## Background

A Harris County grand jury returned an indictment against William Driver for committing the offense of assault of a public servant, specifically a police officer. *See* TEX. PENAL CODE ANN. § 22.01(a), (b)(1) (West Supp. 2014). Driver filed a motion to quash the indictment, in which he claimed that the grand jury that had indicted him had been "tampered with" because some of the grand jurors may have participated in a firearms-training simulator offered as part of the grand jury's initial orientation. Driver claimed that the grand jury was biased against him because the simulator "indoctrinated" the grand jurors to identify with the police in any altercation between a citizen and a police officer. After conducting an evidentiary hearing on the motion to quash, the trial court issued an order denying the motion along with the court's findings of fact and conclusions of law.

Driver filed a pretrial "Motion for Writ of Habeas Corpus and Motion to Stay" that challenged the indictment on the same grounds as in the motion to quash. The trial court denied Driver's request for a writ of habeas corpus and stayed the case pending the outcome of the appeal of the denial. Driver filed a notice of appeal from the order denying his request for a pretrial writ of habeas corpus.

2

## Analysis

"[A] pretrial habeas, followed by an interlocutory appeal, is an 'extraordinary remedy,' and 'appellate courts have been careful to ensure that a pretrial writ is not misused to secure pretrial appellate review of matters that in actual fact should not be put before appellate courts at the pretrial stage.'" *Ex parte Ellis*, 309 S.W.3d 71, 79 (Tex. Crim. App. 2010) (quoting *Ex parte Doster*, 303 S.W.3d 720, 724 (Tex. Crim. App. 2010)). Appellate courts must be careful, on interlocutory review, not to entertain an application for writ of habeas corpus when there is an adequate remedy by direct, post-conviction appeal. *See Ex parte Weise*, 55 S.W.3d 617, 619 (Tex. Crim. App. 2001); *see also Ex parte Smith*, 178 S.W.3d 797, 801 n.13 (Tex. Crim. App. 2005) ("[A] writ of habeas corpus cannot be used as a substitute for an appeal or to serve the office of an appeal."); *Smith v. Gohmert*, 962 S.W.2d 590, 593 (Tex. Crim. App. 1998) ("Habeas corpus is an extraordinary remedy; and, ordinarily, neither a trial court nor this Court, either in the exercise of our original or appellate jurisdiction, should entertain an application for writ of habeas corpus where there is an adequate remedy at law.") (quoting *Ex parte Groves*, 571 S.W.2d 888, 890 (Tex. Crim. App. 1978)). Consequently, "whether a claim is even cognizable on pretrial habeas is a threshold issue that should be addressed before the merits of the claim may be resolved." *Ex parte Ellis*, 309 S.W.3d at 79. "If a non-cognizable claim is resolved on the merits in a

pretrial habeas appeal, then the pretrial writ has been misused, and the State can appropriately petition [the Court of Criminal Appeals] to correct such misuse." *Id.*

A defendant may use a pretrial writ of habeas corpus only in very limited circumstances. *See Smith*, 178 S.W.3d at 801. As a general rule, an indictment may not be challenged in a pretrial application for writ of habeas corpus. *See Ex parte Matthews*, 873 S.W.2d 40, 42 (Tex. Crim. App. 1994); *see also Ex parte Doster*, 303 S.W.3d at 724; *Ex parte Weise*, 55 S.W.3d at 620. The exceptions to this rule are generally limited to complaints regarding prosecutions under a void statute or prosecutions barred by double jeopardy or limitations. *See Maya v. State*, 932 S.W.2d 633, 637 n.6 (Tex. App.—Houston [14th Dist.] 1996, no pet.) (citing *Ex parte Matthews*, 873 S.W.2d 40, 41–43 (Tex. Crim. App. 1994)); *see also Ex parte Tamez*, 4 S.W.3d 854, 855-56 (Tex. App.—Houston [1st Dist.] 1999) ("Pretrial writs for habeas corpus generally may not challenge an indictment except for instances of a void statute or to assert a statute of limitations bar."), *aff'd*, 38 S.W.3d 159 (Tex. Crim. App. 2001) ("We have long held that when there is a valid statute or ordinance under which a prosecution may be brought, habeas corpus is generally not available prior to trial to test the sufficiency of the complaint, information, or indictment."). Conversely, the Court of Criminal Appeals has held that a pretrial writ may not be used to assert constitutional rights to a speedy trial, challenge a denial of a pretrial motion to suppress, or make a collateral estoppel

4

claim that does not allege a double-jeopardy violation. *See Ex parte Weise*, 55 S.W.3d at 620. These issues are better addressed by a post-conviction appeal. *Id.* Pretrial habeas should be reserved for situations in which the protection of the applicant's substantive rights or the conservation of judicial resources would be better served by interlocutory review. *Id.*

Although Driver fails to address the availability of pretrial habeas relief in his appellate brief, his petition filed with the trial court argued that pretrial habeas relief is available to test the validity of the indictment in this case because (1) he "would be released of the charges against him should the indictment be held improper," (2) he "has a substantive right not to be put on trial on an invalid indictment," and (3) "conservation of judicial resources requires that the accused have the right to test the indictment prior to a full trial taking place." Driver further argued that his situation "is similar to a double jeopardy claim, which has long been available pre-trial." Driver, however, offered no authority to support his proposition that the validity of an indictment based on allegations of grand jury bias can be remedied by pretrial habeas relief. Indeed, because Driver's arguments are true of most pretrial challenges to an indictment, they are contrary to the general rule that an indictment may not be challenged in a pretrial application for writ of habeas corpus.

5

Although the Court of Criminal Appeals has narrowly drawn certain exceptions to the general rule against challenging indictments by pretrial writ of habeas corpus, Driver fails to demonstrate that any of these exceptions apply to his case. As this court has explained, a court generally should not grant habeas corpus relief when there is an adequate remedy by appeal. *See Ex parte Wilhelm*, 901 S.W.2d 956, 957 (Tex. App.–Houston [1st Dist.] 1995, pet. ref'd) (citing *Ex parte Hopkins*, 610 S.W.2d 479, 480 (Tex. Crim. App. 1980)). The exceptions to this rule, including pretrial challenges to an indictment or to the constitutionality of a statute under which the defendant was being charged, involve circumstances in which the defendant was asserting a legal challenge which, if successful, would have totally barred prosecution. *See id.*; *see also Ex parte Smith*, 178 S.W.3d 797, 801 (Tex. Crim. App. 2005) (pretrial writ of habeas corpus is cognizable only in very limited circumstances, including certain issues that would bar prosecution or conviction). Unlike the exceptions noted in *Wilhelm*, Driver's challenge to the indictment in this case, even if successful, would not bar his prosecution through a new indictment.

Driver's assertion that his situation "is similar to a double jeopardy claim, which has long been available pre-trial" is unpersuasive. In rejecting a similar attempt to seek pretrial relief, the United States Supreme Court explained the unique basis for allowing double-jeopardy claims to be asserted before trial:

6

> There perhaps is some superficial attraction in the argument that the right to a speedy trial—by analogy to these other rights—must be vindicated before trial in order to insure that no nonspeedy trial is ever held. Both doctrinally and pragmatically, however, this argument fails. Unlike the protection afforded by the Double Jeopardy Clause, the Speedy Trial Clause does not, either on its face or according to the decisions of this Court, encompass a "right not to be tried" which must be upheld prior to trial if it is to be enjoyed at all. It is the delay before trial, not the trial itself, that offends the constitutional guarantee of a speedy trial. If . . . an accused [is deprived] of his right to a speedy trial, that loss, by definition, occurs before trial. Proceeding with the trial does not cause or compound the deprivation already suffered.

*United States v. MacDonald*, 435 U.S. 850, 860–61 (1978). The Supreme Court's reasoning is instructive because, unlike a claim of double jeopardy, Driver has failed to demonstrate that his claim of grand jury bias encompasses a similar "right not to be tried which must be upheld prior to trial if it is to be enjoyed at all." *Id.* at 861.

For the foregoing reasons, we adhere to the general rule that pretrial habeas relief is not available to challenge indictments and therefore affirm the trial court's order denying Driver's request for a pretrial writ of habeas corpus.

7

## Conclusion

We affirm the trial court's ruling denying the pretrial application for a writ of habeas corpus.

Michael Massengale
Justice

Panel consists of Justices Massengale, Brown, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).

APPENDIX 2

**Testimony of Dr. Bryan Sweeney**
*State v. William Driver*
**Harris County District Court Cause No. 1396922**

what he understands the legal requirements of the grand jury are and what the law permits as to what the grand jury does, essentially creating an echo chamber between counsel, who's perfectly capable of arguing the law and a witness who's going to be providing a legal opinion that the Court's perfectly capable of reaching itself.

THE COURT: Then the only thing I can say in that regard is just make an appropriate objection at the correct time.

MR. DURFEE: Yes, your Honor. Thank you.

MR. LOONEY: And the ruling is he'll be excluded from the Rule?

THE COURT: Yeah. It's fine.

MR. LOONEY: Call Dr. Bryan Sweeney.

May I proceed, your Honor?

THE COURT: Yes.

BRYAN SWEENEY, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

Q. (BY MS. BYROM) Would you state your name, please?

A. Bryan James Sweeney.

Q. What is your address?

A.      505 Northview Drive, Friendswood, Texas, 77546.

Q.      Do you have an occupation or a profession?

A.      Yes.  I'm a psychologist.

Q.      And would you tell this Court what kind of training you went through to be able to come into court today and tell us that you're a psychologist?

A.      Sure.  I went to Baylor University for my undergraduate and received a degree in psychology. From there I went to Sam Houston State University for my master's program in generalized psychology.  While there I studied forensic psychology, worked on different research teams, generated a thesis based in the forensic world.  After graduating with my master's at Sam Houston State University, I attended University of Houston to receive my doctorate in counseling psychology.

After that I went to the United States Air Force residency program at Wilford Hall Medical Center, Lackland Air Force Base.  While there I did my residency training as a psychologist and did a two-month-long forensic rotation in which I was trained even further in forensic psychology, had a chance to be an expert witness as a resident.  And from that point, I served in the Air Force for three

years, continued to study forensic psychology, worked with the military in many criminal cases. After leaving the Air Force, I became part of my own practice and have been practicing forensic psychology since that point in time.

Q.    And have you had an opportunity on one or many occasions to speak before peers?

A.    Yes, sir.

Q.    On many or few occasions?

A.    Many, many. I've actually educated the Bar Association on how to use an expert witness.

Q.    And have you had an opportunity to create research publications?

A.    Yes, I have. I've published myself, and then I've been a part of other publications through various research teams.

Q.    And have they been peer reviewed?

A.    Yes, they have.

Q.    And have you had an opportunity to produce other publications as well?

A.    I have. I've written articles for newspapers. I've written a book. Done various, various research, research trainings, research-based trainings.

Q.    And will you tell this Court what a

forensic psychologist is?

A.    Sure.  A forensic psychologist is a psychologist that's not only educated in psychology but on how psychology fuses with the law.  So, psychology is the study of human behavior.  And anywhere where the study of human behavior overlaps with the legal system, a forensic psychologist can be utilized.

Q.    And are you one of those?

A.    Yes, I am.

Q.    In that capacity, have you been called upon on one or many occasions to come into court to assist a trial process?

A.    Many, many occasions.  Yes, sir.

Q.    And would you share with the Court the kinds of cases that you have participated in?

A.    Sure.  I've worked in family law, civil law, and criminal law.  In regards to criminal law, I've been a part of -- I believe my C.V. says roughly 50 cases.  But it has grown since then.  When I am a part of those cases, I can either take on the role of expert witness solely in which I'm essentially there to educate the jury or the Judge, depending on what type of trial they choose, on anything that they need me to that's related to forensic schooling.  Other

times I would be considered an expert consultant at which point I consult from the beginning of the trial all the way through. I'll do things like help develop trial strategy, cross-examinations, openings, closings, jury selection, arguing motions. Anything that psychology can be applied to the law, they utilize me for that.

On top of that, I've worked in the family law field, I think since 2005 or 2006. And I've written many, many custody evaluations. I've done individual psychological assessments. I've consulted in family law. And I've also worked in the civil law area doing assessments and consultation.

Q. And you have also provided those services many times in the military force?

A. Yes, many times. Yes, sir.

Q. Both for the defense and for the prosecution?

A. Yes. Right now I'm running really close to about a 50/50 ratio.

Q. Have you had an opportunity to be retained by us in the case of the State of Texas versus William Driver?

A. Yes, I have.

Q. And have we made materials available to you

for your review?

A.     Yes.

Q.     Before coming to testify today?

A.     Yes, sir.

Q.     Would you tell this Court what all you've had a chance to review?

A.     The materials that you gave me was -- I believe I saw the discovery of the PowerPoint presentation and the simulator.  I was able to watch that a number of times, analyze it, and formulate opinion on it.  I also viewed a brief video of an altercation between a man and some police officers.

Q.     Okay.

A.     And then on top of that, I did much of my own study in preparation for this.

          MR. LOONEY:  Your Honor, I have tendered to counsel a copy of the C.V. on Dr. Sweeney.  And I've marked it as Defense Exhibit Number 1.  I'd like to tender it for admission into evidence for purposes of this hearing.

          THE COURT:  Any objections?

          MS. BYROM:  I have no objection to the admission of his C.V.

          MR. LOONEY:  It's been admitted, right, your Honor?

THE COURT:  Yes.

Q.   (BY MR. LOONEY)  Dr. Sweeney, you viewed, I think you said, a cell phone video of an altercation?

A.    I believe so.  I believe it was from a cell phone.

MS. BYROM:  I'm going to object.  This line of questioning is not relevant and outside the scope of this hearing.

THE COURT:  I didn't understand the question.  What kind of video was it?

MR. LOONEY:  It's a cell phone video, your Honor.

THE COURT:  Cell phone video.

MR. LOONEY:  Yes.  And I'll take a moment to explain where I'm going with this and why I should --

THE COURT:  Go ahead.

MR. LOONEY:  One of the burdens that I have is to indicate that this altercation is an altercation of the kind and character that was influenced by the simulator in the grand jury process.  If they want to stipulate to that, I won't have to prove it.  Otherwise, I have to prove it to meet one of my burdens.

MS. BYROM:  I guess I don't really

understand what precisely he wants me to stipulate to.  I mean, obviously when you have an assault on a public servant, it means there was some sort of altercation taking place between a defendant and a peace officer.  I mean, I would agree with that statement.

MR. LOONEY:  What I need to show is that this is the kind of an altercation that depending upon how the grand jury interpreted the facts presented could have resulted in an indictment or not an indictment against Mr. Driver, could have resulted in an indictment or not an indictment against the peace officer.  If they will stipulate that this is that type of an altercation, I don't need to prove it.  Otherwise, I need to prove it to make the elements of my case.

THE COURT:  This is a different video than what --

MR. LOONEY:  Yes.  This is a video of what happened that night.

MS. BYROM:  This is a video relying the underlying -- that goes to the underlying facts of the William Driver -- the State of Texas versus William Driver.  I don't think that this hearing about whether or not a grand jury was tampered with

by access to a simulator, I don't see how that video is relevant to the determination here today. That goes to introducing facts that are extraneous to this actual hearing and ultimately will be the province of a jury to decide whether or not, in fact, Mr. Driver was being assaulted or whether he was assaulting a peace officer.

MR. LOONEY: And, your Honor, we're not offering it as evidence for Mr. Driver's defense.

THE COURT: I don't know where it was taken, when it was taken, who took it, what the circumstances are.

MR. LOONEY: The State gave it to us as part of --

THE COURT: Gave you what?

MR. LOONEY: The State gave us the video as part of the discovery.

THE COURT: In this case?

MR. LOONEY: Yes.

THE COURT: Okay. I got that.

MR. LOONEY: And we thought that --

THE COURT: But I thought that we were talking about a different video.

MR. LOONEY: No. This is not the video that you've seen.

through a few concepts with you and have you help us to understand what those concepts are, if I can. Would you talk to us about the concept of identification as it applies to these issues?

A.    Sure.  Identification -- what we're going to be talking about is concepts related to social influence and ways that people can be influenced or persuaded.  It doesn't necessarily mean that people are trying to influence them or persuade them, but there are ways that people are actually influenced and persuaded.  Identification is one of the key issues that occurs in people when they are influenced or persuaded.

Q.    If I hear you correctly, you're telling us that people can be persuaded on issues without knowing that they're being persuaded on issues?

A.    Absolutely.  They can be persuaded on issues without knowing they're being persuaded, but they can also be persuaded on issues without the persuader realizing that he or she is actually persuading them.

Q.    So, both the persuader and the person being persuaded can be involved in this process with neither of them knowing that it's happening or having any evil intent?

A.   That's true.

Q.   And identification is one of the ways that this happens?

A.   Yes.  And --

Q.   Go ahead with what identification is.

A.   Well, identification essentially means that somebody identifies with somebody else.  In other words, they may go through the same emotion, they may go through the same experience, they may go through the same training, many different ways this can happen, but they essentially end up placing themselves in that person's shoes.

Q.   Is that what we would call -- the identification process gives us what we would call "empathy"?

A.   It can.  It can develop empathy.  In many cases when we identify with people empathy does develop.  And in that case we start to not just have an understanding of what they're going through but essentially feel what they feel.  So, it's stronger than a sympathetic reaction.  A sympathetic reaction you have an understanding and you feel bad for somebody, you feel scared for somebody.  However, with empathy you actually feel with somebody.  And, so, when you're discussing identification and how

that can lead to social influence, when people empathize, when people identify with, they start thinking, reacting, behaving in similar manners as the person or people that they're identifying with.

Q.    Is this identification process limited to those of weak will?

A.    Oh, absolutely not.  No.

Q.    Is it limited to those with lesser intelligence?

A.    No.

Q.    Are you telling us that it can happen to any of us under the right circumstances?

A.    It can and it does happen.  We all identify with others.

Q.    And do you have any concerns about -- first of all, you looked at this whole simulator process, right?

A.    I did.

Q.    More than once?

A.    Yes, sir.

Q.    In detail?

A.    Yes.

Q.    Replayed it?

A.    Yes.

Q.    Do you have any concerns that whether

intended or otherwise that these grand jurors are being placed in a position to undergo identification?

A.    I do believe they are placed in a position to undergo identification.  And my concerns are that they're identifying with only one party throughout the simulation.  Each scene that was depicted, they were always identifying with the police officer or off-duty police officer.

Q.    You heard the testimony that even after the simulation there is a informal processing period?

A.    That's right.

Q.    Where the resource person is a certified peace officer?

A.    Yes.

Q.    Does that cause you any additional concerns that identification is likely occurring?

A.    Well, that's going to cause me some concern, some in the field of identification but more so in the other fields of social influence.  In regards to identification though, when we're looking at that, it's not so much the didactics that come afterwards, it's not so much the conversation that comes afterwards, it's essentially the person who's going through the simulation is put in the same place as real life scenarios.  And when they're put in the

same place as a real life scenario, they're going to have similar emotions, similar thoughts, and therefore behaviors or actions may develop. And what ends up happening is because they've gone through such similarities, they identify and they begin to think like. And, so, if they're going to think like, influence has just taken place.

Q.    Within a reasonable medical probability, do you have an opinion as to whether or not this identification process takes place with each and every individual grand juror that goes through this process?

MS. BYROM:  Objection.  Calls for speculation.

THE COURT:  I understand.  I'll overrule the objection.

A.    I couldn't tell you if every single person identified.  I believe the design leads to identification.

Q.    (BY MR. LOONEY)  Is it going to happen to many or few people that are exposed to it?

A.    My assumption would be many.

Q.    Is that an assumption within a reasonable medical probability?

A.    I believe it's a reasonable assumption.

Q.    Within a reasonable medical probability?

A.    Yes.  Yes, sir.

Q.    And a grand jury consisting of many people, isn't it, in fact, true within a reasonable medical probability that many if not most or all of any particular grand jury are going to have suffered identification by virtue of having gone through this simulation?

A.    My assumption would be that people that go through the simulation, whether grand jurors, whether it's me or you, and we don't have -- if we're not trying to fight that identification purposefully, if we just go through it blind, then there's a really strong chance that we're going to identify with that. So, yes, if you look at a collection of grand jurors, you would assume that the collection of grand jurors as a whole would form some identification with the police officers or off-duty police officers.

Q.    Now, these assumptions that you keep referencing, are these assumptions conclusions that you're drawing based upon a reasonable medical probability?

A.    Yes, sir.

Q.    They're not just wild guesses?

A.    No.  No.  No.  This is based on all of my

years of studying, understanding social psychology, learning about it, teaching it. These -- what I'm giving you now, it is not based on any test that I've done with the grand jurors. I haven't had access to that.

Q. Yeah. But you're making conclusions based upon a reasonable medical probability based upon your training and experience in your field of expertise?

A. Yes. One of the things I'm going to mention, as a psychologist I am not a medical --

MS. BYROM: Objection. Nonresponsive.

THE COURT: I beg your pardon?

MS. BYROM: Nonresponsive.

THE COURT: All right.

Ask another question.

Q. (BY MR. LOONEY) Let me move to another thought here.

A. Okay.

Q. Are you able to form an opinion based upon the review that you made of this simulator process as to whether or not the identification process within a reasonable medical probability gives grand jurors a strong bias in favor of the police in regard to any police/citizen encounter?

A. I am able to do that. But can I correct

one of the words that you're using?

Q.    Which one would it be?

A.    Medically.  As a psychologist, I can speak psychologically.  So, I just don't want to overstep my bounds in regards to that.

Q.    If I change -- if we go back and we change every question I've asked within a reasonable medical probability and we insert reasonable psychological probability, would your answers be the same?

A.    Yes, sir.

Q.    And now with that alteration, is your answer to my question yes?

A.    Yes.

Q.    As part of your study and in achieving your doctorate degree, you became an expert in statistics, I trust; is that right?

A.    Yes, I took many statistics classes.

Q.    Would it be statistically improbable that a grand jury could go through this simulator and be completely unaffected by it in terms of psychological changes?

MS. BYROM:  I'm going to object to the form of the question and improper use of statistics in it.

THE COURT:  Re-ask the question.

MR. LOONEY: I will.

THE COURT: Or change it.

Q. (BY MR. LOONEY) As to the grand jury that considered Mr. Driver's case, do you have an opinion, given that it has been stipulated that they went through this, do you have an opinion within a reasonable psychological probability of whether or not this particular grand jury suffered in whole or in part, some of the people if not all of the people, from the identification changes causing a strong bias to that grand jury?

MS. BYROM: Objection to the form and invading the province of the ultimate trier of fact.

THE COURT: Well, I'll overrule the objection.

A. I believe that it is probable that either members, many members, at the very least somebody on the grand jury identified with the police officers or the off-duty officers in the simulation.

Q. (BY MR. LOONEY) And that would cause a strong bias to favor the officer in that encounter?

A. Absolutely.

MS. BYROM: Objection. Calls for speculation.

THE COURT: Overruled.

Q.    (BY MR. LOONEY)  Would you tell this Court about Zimbardo's prison study, what it was?

A.    Sure.  Zimbardo did the Zimbardo Stanford prison study.  And I believe -- I may get the date wrong, but I believe it was in the 60s.  And essentially what he did was he put an add out for college-aged males to participate in what he termed a prison study.  And in this study he had I believe it was 24 -- something like that -- I may mess up the numbers -- young college male students come and participate in the study.

And he essentially made the basement of a building at Stanford University a prison.  He hired consultants that had been imprisoned and those that actually imprisoned others to come in and help him make the jail essentially as realistic as possible.  When he did this, he split them up into nine prisoners and the rest ended up being the prison guards.  None of them had had any training in being prison guards.  None of them had committed any crimes.  But he made this as realistic as possible.  He even went as far as to arrest the people that were going to be the prisoners at their homes with them having no prior knowledge of when or where this was happening.  They just went over there and brought

them to the prison.

From that point he put the prisoners in the role of prisoners and the guards in the role of guards. The prisoners were there 24 hours a day throughout the study. It was supposed to last 14 days. But due to what he noticed as far as the identification of the students identifying with both the guards and the prisoners, it ended up only lasting six days because the identification was so strong.

Essentially what happened was the prisoners very quickly took on the role of prisoners and acted very similarly to how prisoners act in the prison system at that time. And the guards became very authoritative, very aggressive. They started using many of the same techniques that prison guards actually use, without any training whatsoever. They would psychologically manipulate the students. They would -- at some points they became physical. Finally after learning all they needed to learn and realizing, wow, this identification is so incredibly strong, we're at a point where this can become dangerous to these students, he decided he had to end the study.

And to this day it's one of the

strongest studies that people understand. It guides so many aspects of social psychology as far as the role that identification has and how we can actually take on somebody else's mindset, their beliefs, their behaviors. And there was nothing about the guards or the prisoners, nothing at all through all their psychological testing and interviews that would have suggested that it would have had any kind of change in them.

Q.    And has that study been peer reviewed subsequently?

A.    Absolutely.

Q.    On one or many occasions?

A.    Many, many, many.

Q.    Is it generally accepted as valid within your field?

A.    It is a landmark study. It has -- the ethics of it have been questioned due to the time. It's probably a study that may not be allowed to be done today because the first thing we have to do is we have to protect, and by having others identify that strongly it put them in a bad psychological place. So, nowadays it probably wouldn't be allowed to be done. Then it was landmark. It's still taught constantly. I --

Q.    When you said the ethics would now be in question, that has nothing to do with the validity of the study?

A.    Absolutely not.  It only has to do with they identified so strongly with the people.

Q.    People went through some bad changes that affected them in ways that we wouldn't permit you guys to experiment with today; is that what you're saying?

A.    That's a great way of putting it.

Q.    Now, how does that study relate to this grand jury simulation process, if it does, in your opinion?

A.    Well, in my opinion, the study relates because of the level of identification that took place.  When you're looking at the situation, when you're looking at the simulation that the grand jurors go through, it evokes -- essentially it evokes a high level of emotion.  And when they're walking through and they're holding a gun in their hand -- first of all, holding a gun in your hand is a very powerful physiological feeling.  There's many people out there that have never done that.  There's many people that do it all the time.  But holding it puts you in a certain mindset.  You feel strong.  You feel

ready.  You can also feel scared.

So, as they're walking through and they're put in these different situations, depending on how they act or react and depending on what happens if they react or don't react, they feel emotion.  And it's what we -- we term it the "fear appeal."  When you're using fear as an influential agent, it's one of the strongest influential agents you can use.

Q.   So, are you telling us that when a person experiences fear as part of the identification process that is one of the emotions that is most likely to cause identification?

A.   Yes.  It's an extremely strong emotion that can lead to identification.

Q.   And if to the extent that people experience momentary feelings of fear while in that interactive video with the weapon in their hand --

A.   Uh-huh.

Q.   -- is that a situation that is highly likely to cause that identification?

A.   Absolutely.  They relate to the officer from the officer's point of view.  They don't see any other point of view.

Q.   And you believe that that happens with a

very high number of people that are exposed to this simulation?

A.    It's hard for me to say the number, but I do believe looking at the simulation is greatly influential.

Q.    Would it be a high number or low number that get influenced?

A.    I would assume that it would be a high number.

Q.    Is that within a level of psychological probability that you're comfortable with?

A.    I believe so.

MR. LOONEY:  May we play the video now, your Honor?

THE COURT:  Sure.

MR. CONRAD:  I'm not sure how loud this is going to be.  I hope it doesn't blast, but we'll see.

THE COURT:  I've been blasted before. So, we'll see.

(Video played in open court.)

MR. LOONEY:  Your Honor, I have just been made aware of the two videos, that we have them on separate D.V.D.s.  There is a second one as well that we would like to admit into evidence.  Do we

need to do that separately or include it with the first one?

MS. BYROM: The State will renew our objection again that this is outside the scope of the hearing. There has been no predicate or foundation laid for its admission. And that to review it would inevitably go into questioning the province of the grand jury and what happened behind closed doors.

THE COURT: Is this one of the videos that you submitted to them as part of the discovery process?

MR. LOONEY: Yes, your Honor.

THE COURT: Okay. I'll allow it.

MR. LOONEY: Do we need to mark it separately?

THE COURT: Separately.

MR. LOONEY: So, this will be Defense Exhibit Number 3, and the other one is Number 2. And while he sets that up, I'm going to --

THE COURT: All you have to do is just put it in. I think it should be ready to go.

MR. LOONEY: Okay.

(Video played in open court.)

THE COURT: It looks like the same one as the other one.

MR. LOONEY: It's longer.

(Video continues playing in open court.)

MR. LOONEY: May I proceed, your Honor?

THE COURT: Sure.

Q. (BY MR. LOONEY) Dr. Sweeney, you viewed this video as part of your preparation to testify here today, right?

A. I viewed the first one. This is the first time I've seen this one.

Q. All right. Now, the interaction that you saw there, is it the kind of interaction when reviewed by a grand jury that's been through the simulator process that we're talking about here today, is this the kind of interaction that would cause grand jurors to view and make decisions in an altered manner because in part the identification process?

A. I think after going through the simulator they're going to think of things from a cop's point of view versus from anybody's point of view. And, so, when you look at just that piece of it, what point of view they would look at it, they're going to be more likely to say, "What do you think the officer

was thinking?  Do I think the officer was afraid? How do I feel the officer was feeling at that point in time?"  Which because of the simulation and them identifying with the officer, they may look at it differently.

Q.    Now, if the video was a video of somebody standing with two pistols in his hand and firing and an officer ducking and shooting, we wouldn't be so worried about an influenced decision?

A.    Well, I still think in that situation they would be identifying with the police officer.  So, in any of the situations where there's a police officer in a violent altercation, whether he was right, wrong, or we don't know what it was, they're going to identify with a police officer after going through that.

Q.    And are the ramifications of that identification even greater in a situation like that you saw on the video?

A.    Help me understand the question.

MS. BYROM:  Objection to the form and vague.

THE COURT:  I beg your pardon?

MS. BYROM:  Object to the form.  It's vague.

MR. LOONEY: He said he didn't understand it. So, I need to rephrase it.

THE COURT: I guess so.

Q. (BY MR. LOONEY) The altercation you saw on the video, does it cause you a great level of concern about whether or not the grand jurors would have made a decision that was based in whole or in part upon an altered mental perception because of the grand jury process that they went through in the simulator?

MS. BYROM: Objection. Relevance.

THE COURT: It's overruled.

A. I'm concerned that them going through the simulation would bias them when they're looking at the facts and trying to determine things.

Q. (BY MR. LOONEY) Is that especially acute in a case like this?

A. I believe so.

Q. Now, would you talk to the Court about the concept of persuasion as it relates to what we're here today on?

A. Sure. Basically people can be persuaded. People's attitudes, their mindsets, their cognitions can be persuaded by others. When someone is persuaded, it essentially means that thoughts, beliefs, value systems can change based on what's put

in front of us. So, there are many factors that can lead to persuasion. One of the factors that often gets overlooked is the source. Whether the source means to persuade or not, he or she can be persuading. And some of the factors that would lead to the persuading are how credible the source is, how trustworthy the source is, and if that person is considered an expert in that field. So, if you have a trustworthy, credible expert giving you information, it's likely that that information will persuade you as long as you see them that way.

Q. Now, if an assistant district attorney in the grand jury process is providing information and sponsoring a simulation, do you have an opinion on whether or not the issue of persuasion is raising its head in that environment?

A. I absolutely believe that if it's an assistant district attorney that is giving the information to selected grand jurors, that that person would be looked at as credible and trustworthy and as an expert. So, whatever he or she is going to say would be more persuasive than if this were somebody that wasn't credible, that had absolutely no understanding or knowledge of the information being passed on, and wasn't trustworthy. So, absolutely.

Q.    And do you have an opinion as to whether or not an assistant district attorney in this environment that we've been discussing, if they highlight and bring attention to certain segments of the statute, do you have an opinion of whether or not that would bring into play the psychological issue of persuasion?

A.    Yes.   What's likely to happen is that anybody seeing that is going to question, whether consciously or subconsciously:  Why is this the information that's being highlighted?  Why is this underlined?  How come I'm only seeing this portion of it?  They must be trying to tell me something.

So, when you do that, you know that this is the person that's essentially leading you and you want to know what it is they're trying to tell you.  You're going to be more focused on that. You're going to be more aware of that.  And you're going to probably be more persuaded by that.

Q.    Now, after they went through this simulation, they have a processing period led by a certified peace officer.  Is that certified peace officer likely to be viewed as a credible and trustworthy figure?

A.    Absolutely.

Q.    And is that going to affect the way these grand jurors going through this process take in the information provided by that certified peace officer during the processing period?

A.    I believe it could have a strong effect.

Q.    By the time that they have gone through the highlighted statute and then the interactive process with the weapon in their hand and then they process it with a certified police officer, do you have an opinion as to whether or not the grand jurors' thought process is likely to be altered significantly because of the issue of persuasion?

A.    Sure.  And when we go back to --

Q.    If you do, what would that opinion be?

A.    Well, when we go back to persuasion, there are other elements of the simulation that are going to have a big effect on how we are persuaded.  When we are --

Q.    Before you do that --

A.    Sure.

Q.    Can you share with us what your opinion is? Are they going to be highly altered in their --

A.    I would expect that they would be altered, yes.

Q.    Within a reasonable psychological

probability that would happen to every one of us?

A.    I can't say every one of us.  There's always going to be outliers.  But I would say the normative sample would be altered.

Q.    So, the only people that wouldn't be altered would be what you just referred to as the "outliers"?

A.    That would be my assumption.

Q.    And to gather enough outliers to make one whole grand jury of nothing but outliers, that's statistically very improbable; is that right?

A.    I think it would be very improbable.

Q.    So, there's a high statistical probability that within a psychological probability Mr. Driver's grand jury having gone through all of those processes has a highly altered state of affinity with police officers and issues resembling the one that Mr. Driver was involved in.  Is that fair to say?

A.    Well, again, I need to go back to -- when we're talking about statistics, it's hard for me to say anything statistically being that, as far as I'm aware of, they have not done any studies on the effect that this would have on a grand jury.  What I would say is my assumption, I would feel strong in that assumption that I would assume the majority of

people would be effected and persuaded and would identify with officers and would be persuaded by the people presenting information.

Q.    And that, like all of your other assumptions, is within a reasonable psychological probability?

A.    I would believe so.

Q.    And you were going to explain more about the issue of persuasion?

A.    Well, so, when we're talking about persuasion, much like identification, it's often more affected by the emotional reactions.  It's one of the reasons -- let's use fear again.  They call it the "fear appeal."  One of the reasons that fear is so strong is because it's a basic fundamental human emotion.  Everybody's felt fear, and fear is scary.  Fear resonates.  Fear sticks with us.  And, so, when you're using a situation where empathy is developing by going through what somebody else is going through and essentially feeling what they feel, that's going to have a much greater impact as far as how we're persuaded.  And it's one of the reasons that when you watch commercials, for example --

MS. BYROM:  Object to the narrative.

THE COURT:  All right.  Ask another

question.

Q.   (BY MR. LOONEY)  And fear is one of the, if you will, bonding elements of persuasion?

A.   It is one of them.  Yes, it's one of the stronger emotions.

Q.   And how would the method of producing television commercials produce this bonding fear element in us?

MS. BYROM:  Objection.  Relevance.

THE COURT:  I don't understand the question either.  From a relevance standpoint, I mean, I'll sustain the objection.

Q.   (BY MR. LOONEY)  So, fear is one of the bonding elements.  When you were looking at this simulator, were there one or many occasions where the person engaged in the simulator would experience fear?

A.   I think there were many.

Q.   And that's going to bond this element of persuasion?

A.   I think -- so, when you're looking at the simulator, you see things like somebody holding a baby, you see a child next to a man in a convenience store, you hear music when it says no action is taken afterwards.  All of those things would increase

someone's fear response.  If you're in the process and you're going through this, it's going to have an emotional effect on somebody.  And if it has an emotional effect, that will increase the persuasion of it.

Q.    Okay.  Now, this simulation, do you have an opinion on whether it was evenhanded or one-sided in its presentation of situations?

A.    Well, at no -- one of my concerns with it is at no point do they show you anything from the victim's eyes.  For example, when you see the -- I don't know if he was off duty or if he was -- no, I believe he was an on-duty police officer.  And he pulls up to the car, and the two people are arguing inside of the car.  We don't know what happened inside of that car.  We never see it from their point of view.  The only point of view that's ever presented is the person with the gun.  So, we don't know how afraid the man getting out of the car was. We don't know how afraid the man with the rock was. We don't know how afraid the man holding the baby was.  We never see anything from their point of view. We only see it from the officer or off-duty officer's point of view, which causes people to be more -- identify more with, persuaded by, and it increases a

bias.

Q.    Let's move to an issue called "confirmation bias."  Could you explain that to the Court, please?

A.    Sure.  Confirmation bias occurs when we formulate a belief, we formulate a value, we formulate an understanding of something.  And then when information is presented in front of us, we tend to look for the information that aligns with our current values, that aligns with our current understanding of situations.  And at the same time what we'll tend to do is we'll tend to ignore information that doesn't fit with what we already believe.

It's one of the reasons, for example, that people argue so greatly for their favorite football team.  They will make statements that this is the best football team out there.  And then they're going to go on and tell you every statistic that makes their team great, but they won't listen to any statistic from somebody else that tells you why your team is not great.  And it's something that we all do.  We're not even aware we're doing it.  But we tend to take information that fits with what we already believe, assimilate that information, and we tend to ignore information that doesn't fit.  And,

so --

Q.   Do you --

A.   You want me to go ahead?

Q.   Do you have -- having viewed the simulator, do you have any fear that the simulator is conducted in such a manner to make probable confirmation bias in people that have participated in that simulator?

A.   Where my fear would lie is that they go through the simulation, they identify with the officers, they're persuaded by the simulation, they're persuaded by the people that are showing them the simulation.  So, at that point cognitions, beliefs, value systems formulate.  They're thinking. They have empathy.  They feel the same way the officers would feel.  And at that point it's likely that when information is presented to them, confirmation bias will exist and they will take the information that fits in what they felt when they went through the simulation, what they learned from the PowerPoint coming from an expert, someone whose job is to prosecute crime, and now the message that they've got is these are all the reasons that we do not want to prosecute this crime, and that's going to absolutely affect the confirmation bias.

Q.   Do you have an opinion as to whether or not

a person that has been through this simulator would know that they had confirmation bias or not?

A.    It all depends on their background and their experiences.  Most of us are unaware of when it happens.  I know about this, and I still do it.

Q.    Now, on identification, persuasion, and confirmation bias, is it likely that when that happens to a layperson like me, we don't even know when it's happened?

A.    We're not going to know -- I don't think we're going to know the effect.  I think sometimes we'll know when we're persuaded.  Sometimes we won't know.  Sometimes we'll feel -- we feel that we identify with people, but we don't really know that that's the cognition that we're operating under at that time.

Q.    Will we have an altered thought process even if we don't know why?

A.    Yes.

Q.    Is that, in your professional opinion, what's happening to the grand jurors in Harris County, Texas, that are put through that simulator process?

A.    I believe that the simulation would have that impact on people.

Q.    Even if the people that were putting them through it had no intention of doing that and even if the people that were put through it had no idea that it had happened to them, it's going to happen to many people in there?

A.    Yes.  Motivation has nothing to do with it.

Q.    And that would be a bias?

A.    Yes.

Q.    That would be beneath our conscious level but still operating on the decisions we make?

A.    Sure.

Q.    Talk to the Judge about the concept of group effect, please.

A.    Okay.  So, groups, when we are part of a group, that has a huge affect on us whether we know it or not.  In this particular situation -- and there's -- I mean, I could talk about the effects that it would have forever.  But in this particular situation, when you take --

MS. BYROM:  I'm going to object to the form of the question in that it's vague and overly broad.  If he could more narrowly tailor his question --

THE COURT:  I think he was asking for a definition.

MS. BYROM: Right. And I feel like we're going to hit another narrative patch unless it's more narrowly tailored to a question --

THE COURT: Well, I'll allow some leeway because it's an expert and I assume that you could break the questions down and you're going to get the same answer.

But go ahead and ask another question.

Q. (BY MR. LOONEY) Would you define for us just the definition of what the concept of group effect is?

A. Well, essentially the group that we're a part of will have a social influence on us.

Q. Okay. Now, when you say, "The group that we're a part of," if we go through activities together, does that enhance the social effects that it's going to have on us because we're veterans of the same activity?

A. Yes.

Q. And is that going to alter the way we view it and assess information, whether we realize it or not?

A. The group effect can.

Q. All right. Now, did you see anything in this simulator process that causes you to believe

that the group effect is happening to the people that go through this simulator?

A.    Well, I would have to take that a little bit further down the road then first.  What you would -- as far as the formulation of a group, because they all went through a training together and they are all aware that each other went through the same training and through the same simulation --

Q.    They all held the same guns.

A.    All held the same guns.

Q.    They all went to the same situation.

A.    Yes.

Q.    They all listened to the same expert tell them about what they're about to see and how the law is.

A.    Yes, that could develop a group cohesion.

Q.    They're all doing it in the basement of the same building.

A.    Right.

MS. BYROM:  Object to the leading form.

THE COURT:  Go ahead.

Don't lead your witness.

A.    Because they go through the same process, because they've gone through the same training, that

will increase the group cohesion.

Q.   (BY MR. LOONEY)  What about going through the same after training processing led by a certified peace officer?

A.   That will also increase the group's cohesion.  They'll all know that they all know the same thing.

Q.   Now, we have talked about identification, persuasion, confirmation bias, and now group effect. Could group effect alone be tainting the thought process, consciously or subconsciously, of grand jurors in assessing interactions between citizens and police officers?

A.   Yes.

Q.   When applied in combination with the other issues, does that make it even more likely that the altered thought process is serious and substantial?

A.   It's hard to say that it makes it more likely.  I would say each of those elements all contribute greatly to the likeliness of being influenced.

Q.   Let me ask you this:  It seems like if I perhaps am not so sensitive to the identification process --

A.   Uh-huh.

Q.     -- are you then saying that I might get caught up in persuasion and get to the same place but not any more so than the person that was with identification?

A.     You could, yes.  One or all, any or all could have affect.

Q.     So, all the things we're going to discuss today, any one of them could catch me up, alter my thought process, have me evaluate information in situations, and come up with conclusions that I wouldn't have made, any one of them could, and all I need is for one of them to catch me at a vulnerable moment that I'm aware or unaware of; is that right?

A.     I wouldn't even say you have to be at a vulnerable moment.  I mean, this is normal human social influence.  Doesn't have anything to do with vulnerability or intelligence or anything else.

Q.     And we're going to go through a few more of these; but since all we need is one of them to catch us up to change our mindset when viewing doubt and making decisions, the fact that there are several different phenomenon, does that make it highly likely that every individual is going to get caught by one or the other and have an altered mindset going through this?

A.   Again, I can't say that every individual; but I think it's highly likely that individuals will be affected.

Q.   And I believe you used the phrase a few outliers won't be?

A.   True.

Q.   But those outliers might be caught up by another one of these elements, right?

A.   Sure.  Yeah.

Q.   And, so, by the time we finish grouping them all, even the number of outliers is going to be fewer?

A.   You would expect it to be.

Q.   Within a reasonable psychological probability?

A.   Right.  And that's -- I'm not basing that on statistical analysis.

Q.   Just your training and experience and time in the field?

A.   Yes.

Q.   Now, is there anything else you feel like you need to tell us briefly about the group effect so that we can understand how it's applied?  And I'll get to the application in a minute.

MS. BYROM:  Objection to the form.

Vague.

THE COURT:  Overruled.

Q.   (BY MR. LOONEY)  Have you fully defined it for us?

A.   I've defined it, but there's some components that I think are necessary to discuss.

Q.   Can you tell me by name what they are?

A.   Conformity.

Q.   Okay.  Will you tell the Judge what conformity is and why it applies?

A.   Well, conformity basically entails just -- you may have some feelings, you may have some thoughts on your own; but if you believe the group has differing thoughts or differing feelings, you're going -- not always, but you're likely to conform to the group.  There's this saying:  If you want to be a part of the group, agree with the group.  And that would -- that's a good way of defining conformity.

Q.   All right.  Now, this group effect, based upon what you know from having reviewed the video and having reviewed the simulation package, within a reasonable psychological probability are participants being affected by the group effect that you're going to discuss?

A.   I believe they can be.

Q.    Do you believe that it's likely that many are?

A.    I would assume that it's likely.

Q.    And that assumption is -- it's not a wild guess?

A.    No.  It's a strong assumption.

Q.    Through your reasonable psychological probability?

A.    Yes, sir.

Q.    Tell this Court about cognitive dissonance.

A.    Cognitive dissonance is another effect of social influence.  Essentially what happens with cognitive dissonance is we have values, beliefs, and behaviors, and sometimes those don't match up with each other.  So, we may have a value system that doesn't match with the way that we're acting or we may have a belief system that doesn't match a value or we may have one value system that is now affected and is changing.  And, so, when we have these things and they don't align, we develop -- I think the best way of understanding is we develop an internal static, a high level of discomfort.  It can lead to many, many psychological processes.  But essentially it's a high level of psychological and emotional discomfort.  So, what we have to do then to make

peace with a cognitive dissonance is we have to change one thing to match the other. And by doing that, we relieve ourself of the dissonance. We get rid of the static.

Q. Is this -- in your opinion, is this simulator process causing cognitive dissonance in a participant?

A. It depends on the belief and value system that they have before they come in.

Q. Okay.

A. So, if somebody comes in and they believe that firearms should never, ever, ever be utilized ever and they have a strong value system but then they come in and they feel what it's like to have someone shoot at you or shoot at your kid or chase you with a rock or a knife and they've held that gun in their hand and they feel the power that they yield and they feel that fear and they go through it all, then it's possible that that value system may start changing. And as they go through that, they have to make peace with that value system. So, now you've got emotions and behaviors that don't match with values. So, they've got to change one or other. They've got to change something.

Q. Okay.

A.    And it's likely it's -- not all the time, but it's likely that that form of social influence could actually change their original value systems.

Q.    So, do you have an opinion on whether this simulation process is causing people with value systems outside of the average group of people to experience cognitive dissonance?

A.    This is one that I will say that I believe it could.

Q.    Could?

A.    I can't say that I will or I strongly assume.  But I believe in this case when we're talking about cognitive dissonance, it could cause that dissonance.  Now, what they do with that, I couldn't tell you.

Q.    If you can't tell us that within a reasonable psychological probability that it will, I'm going to let it go and we'll move to another one.

A.    Okay.

Q.    You can't do that, right?

A.    I can't.

Q.    Okay.  Now, you have specific concerns about this process --

A.    I do.

Q.    -- that we haven't talked about yet, right?

A.     You and I or the --

Q.     In the court here.

A.     Some of the concerns have been talked about.  I wasn't a part of it.  But I have some concerns that you and I have not talked about as well.

Q.     Okay.  Tell this Judge in thumbnail sketches the additional issues that you have concerns with the psychological impact of what they're doing with this simulation process?

MS. BYROM:  Objection to the form and overly broad.

THE COURT:  I'm sorry?

MS. BYROM:  Form.  Overly broad.

THE COURT:  Overruled.

A.     One of my concerns that can develop is when we're taught something by someone that's supposed to be an expert, by someone that is our leader, and they're showing us or they're teaching us something that's put in front of us as fact, whether we agree with it or not, whether we've actually changed due to any of the social influence at all, human beings -- it's common for human beings to go ahead and agree with what was being taught to us versus what we actually think because that alleviates the

responsibility of our decision.  So, what essentially happens is you'll have this mindset of, "Well, I mean, I don't know if I agree with it or not, but that's what the law says, so that's how I have to vote," or "That's what they wanted me to know and this is the person telling me this, so that's how I have to act."

And, so, there's not really a name for that; but essentially by being educated in the way that these people are being educated through the stimulation, through the didactics, and who essentially is educating them, you run the risk of having them alleviate the responsibility of having to say, "Yeah, I'll vote this way because you want me to vote this way.  Whether I agree with it or not doesn't matter."  And that's another one of my concerns in regards to this.

Q.    (BY MR. LOONEY)  Dr. Sweeney?

A.    Yes.

Q.    Do you believe that after they go through this simulation process, whether the grand jurors know it or not or whether the district attorney intended it or not, that these people are no longer a cross-section of the thought processes within our county?

A.    I do believe that.  I believe that a bias will form.

Q.    And they are now viewing every case involving an interaction between peace officers and civilians as biased grand jurors?  Is that your opinion within a reasonable psychological probability?

A.    I do believe that.

Q.    And will that bias cause us to never know what their decision would have been had they not been tainted?

A.    Yes.

Q.    If the jury is to serve in part as a buffer and as a safety valve as to interactions between citizens and government officials generally and police officers specifically, do you have an opinion about whether or not this simulation process has tainted every one of those grand jury considerations in Harris County, Texas, for so long as it has been used?

MS. BYROM:  Objection.  Calls for speculation and invades the province of --

THE COURT:  Yeah.  Well, I'll let him answer.

A.    I believe that those grand jurors that have

watched the simulation would be biased, would be tainted.

Q.    (BY MR. LOONEY)  Can you think of any psychological reason why it would not be sufficient to allow the grand jurors to read the plain statute and then ask questions if they desired as opposed to going through simulations?

A.    I can't understand why that isn't the process.

Q.    From a psychological perspective, if they were allowed to just read the unaltered statute and follow the legislative process for getting clarifications, would they then be an unbiased grand jury in Harris County, Texas?

A.    In regards to this, yes.

Q.    The cumulative impact of all of the different psychological issues that have come into play, do you have an opinion on whether or not it is appropriate to use a simulation process designed for the training of police officers and follow it up with a processing period by a certified peace officer?  Do you have an opinion as to whether or not that can ever be an appropriate training video if you want to create an unbiased grand jury?

A.    If you're trying to create an unbiased

grand jury, then you do not want to use this training.

MR. LOONEY: Pass the witness, your Honor.

MS. BYROM: I'm going to request at least a five-minute recess.

THE COURT: That's fine. Sure.

(Recess taken.)


MR. LOONEY: Your Honor, before we call him back up, I wanted to ask the Court for permission to take Professor Schmolesky out of order.

THE COURT: Who is Schmolesky?

MR. LOONEY: The law professor. He has got a class at St. Mary's in San Antonio this evening.

THE COURT: He's got an appointment at 1:00 o'clock with his office.

MR. LOONEY: Who does?

THE COURT: He does.

MR. LOONEY: He's canceled that.

THE COURT: I know he did.

MR. LOONEY: If it doesn't inconvenience the Court, I'd like to take Professor Schmolesky out of order.

THE COURT: Well, I tell you what, I'm going to let them -- I don't really care.

Do you care?

MS. BYROM: Actually, your Honor, I do. I'm not trying to be a jerk; but at the same time, you know, I feel that while we have him on, let's get him over with.

THE COURT: All right. Okay.

MS. BYROM: I don't want to lose my train of thought.

THE COURT: Okay. Okay.

MS. BYROM: Thank you. May it please the Court?

THE COURT: Yes, ma'am.

MS. BYROM: Thank you, your Honor.

CROSS-EXAMINATION

Q. (BY MS. BYROM) Good afternoon, Dr. Sweeney.

THE COURT: You know -- excuse me just a minute. I don't know -- I told the other witness that they didn't have to -- he could stay in court. He just left. I think he must have --

MR. LOONEY: That was my misunderstanding.

THE COURT: Okay.

MR. LOONEY: I thought you said he had

to exit.

THE COURT: No.

MR. LOONEY: We'll get him right back.

THE COURT: No. I didn't mean to --

MR. LOONEY: He understood it exactly as you now understand it. I misunderstood it and overruled it.

THE COURT: That's okay. But if he wants to sit in here, he can.

But go ahead.

MS. BYROM: Thank you, your Honor.

Q. (BY MS. BYROM) Good afternoon, Dr. Sweeney. How are you?

A. Good.

Q. You and I have not spoken before. So, I may refer from time to time to your curriculum vitae.

A. Okay.

Q. Which I think has been admitted already; is that correct?

A. Yes.

Q. Great. Okay. Dr. Sweeney, I know that you stated that you testify frequently as a forensic psychologist.

A. Yes.

Q. But you also have a practice here in town,

correct?

A.    I do down in Clear Lake.

Q.    Okay.  And what is the focus of your practice in Clear Lake?

A.    It's about 50/50, about half of forensics and half of counseling clinical.

Q.    When you say "counseling clinical," what do you mean by that?

A.    I treat patients.

Q.    For what sorts of disorders or mental health issues?

A.    Mostly life issues, relationship issues, depression, anxiety.  Every now and then it will take more of the form of a clinical disorder like bipolar disorder, sometimes schizophrenia, normal clinical psychology and counseling psychology stuff.

Q.    And when you say that the other 50 percent of your practice is forensic psychology, what do you mean by that?

A.    I'll work on forensic psychology cases, I'll do evaluations, assessments.  I travel all over the world to work on criminal trials through the military.  I do -- I come to court like I'm doing today.  Anything that involves the legal system where they employ me.

Q.    Okay.  But you would agree with me that by saying that you're a forensic psychologist, that encompasses a large quantity of topics, right?

A.    Yes.

Q.    Okay.

A.    Sure.

Q.    Have you testified before specifically regarding the use of simulators and its effect on grand juries?

A.    No.

Q.    Have you testified regarding grand juries before?

A.    No.

Q.    Okay.  So, this is your first time really to talk about grand juries and the affect of a simulator?

A.    Yes.

Q.    Okay.  Regarding grand juries, are you aware of the differences between the roles of a grand jury and a jury that you would find at trial?

A.    Yes.

Q.    Okay.  What is the difference in their purposes?

A.    Well, the purpose of a grand jury is to decide if there is enough information, if there's

enough evidence for a complaint, a charge, to move forward for an indictment to be made to where it can either go in front of a jury or to where something can be taken care of after that point. So, they're deciding indictments.

Q. So, you would agree with me then that the purpose of a grand jury is more investigative and accusatory in nature than a regular jury?

A. I guess.

Q. Okay. So, you would agree with me that it has a different role?

A. Definitely.

Q. Okay. And in terms of -- I know you said that you've taught before. Have you taught specifically on the topic of forensic psychology?

A. No.

Q. So, I assume that you've also not then taught about the effects of simulators on grand juries?

A. No, I have not.

Q. Okay. And you also have not published any articles about the effects of simulators on grand juries?

A. No.

Q. And you've already stated that you have not

testified as an expert on the use of simulators on grand juries, correct?

A.   Correct.

Q.   Okay.  In preparation for this case, did you pull any data or statistics from our district clerk's office?

A.   No.

Q.   Did you look into how many cases have been indicted versus not indicted by any of our grand juries?

A.   No.

Q.   So, when you say that you feel that there is a certain psychological probability, you're not basing that on any sort of numbers or number crunching or statistical analysis that you have performed?

A.   No.

Q.   Okay.  I want to talk about some of the concepts that we discussed earlier that you discussed with the defense earlier.  You brought up that there are was a term called "identification," right?

A.   Yes.

Q.   And during that you stated that the way identification works is that somebody begins identifying with somebody else, correct?

A.    No, I did not.  That's -- I didn't say that was the way.

Q.    Okay.

A.    That is a result.

Q.    That is a result?

A.    You can identify with people, you can identify with things, you can identify with different situations.

Q.    Sure.  And you would agree with me that a simulator, you say, is one way that identification can occur, correct?

A.    Yes.

Q.    But it's not the only way, right?

A.    True.

Q.    Okay.  So, you had a chance to review the video that defense counsel admitted, correct?

A.    Yes.

Q.    And you saw that it took place at the Houston Rodeo cookoff, right?

A.    I don't know where it took place.  I'm going to assume that, yes.

Q.    Okay.  Well, let me ask it this way:  You would agree with me that maybe similar backgrounds could cause peopling people to identify with somebody else?

A.    Yes.

Q.    You would agree with me that similar common experiences could cause somebody to identify with somebody else?

A.    Yes.

Q.    So, would you agree with me that it's possible that if a grand jury found out that maybe if a grand juror was in oil and gas and they found out that a defendant was involved in oil and gas, they may identify with the defendant in that set of circumstances?

A.    It's possible.

Q.    And you would agree with me that if the grand juror reviewed that tape and saw where it occurred, the grand juror might say, "I know that area, I've been there, I have a common experience with that defendant," and might actually identify with the defendant in that situation?

A.    Yes.

Q.    Okay.  So, certainly it's not your testimony here today that you know exactly who each and every one of the grand jurors identified with in this particular case of the State of Texas versus William Driver?

A.    No.

Q.    Okay.  You stated earlier that one of your concerns with the simulator is that it always placed -- the grand jurors could be placed in a position to undergo identification because they will always identify with the police officer or off-duty officer, correct?

A.    Are those the words I used?  Is that what you're asking me?

Q.    That was the gist of what you stated earlier.

A.    Essentially what I'm getting at is that because they're doing it through the eyes of the officer, that they're going to feel -- it's designed so they feel and think as an officer would.

Q.    Right.

A.    So, that would be who the identification would be with.

Q.    But you would agree with me that in all of these simulations it involves whether or not it was appropriate for the person whose shoes are they are in, whether it's appropriate for them to fire a weapon in that set of circumstances, correct?

A.    Well -- so, when I watched it, I did not hear appropriate or not appropriate.  You know, I watched it and they would show a scene and then it

would say one, two, three seconds until the next scene, and then they would flash a badge, and then they would say the next scene. I'm not -- I don't know what was being said to them afterwards, before. I haven't seen the scripts. So, I'm basing that on they're going through the eyes of the officer.

Q.     Okay. Well, backing up, you were allowed to sit in here and listen to the testimony of Julian Ramirez earlier, correct?

A.     Yes. That's correct.

Q.     And you heard him state that there are circumstances in the simulator where, for example, someone points a cell phone at you and you could shoot the person?

A.     Uh-huh. I did hear him say that.

Q.     And that the person would die or be injured by your gunshot?

A.     Yeah. I heard him say that.

Q.     So, does it change your opinion now that you know that there are -- that the simulator also demonstrates negative consequences to firing a weapon?

A.     Which opinion? Who they identify with?

Q.     Yes.

A.     No. They would still identify with the

officer.

Q.    Okay.

A.    Whether it was right or wrong.

Q.    So, are you -- I guess what I'm trying to get at is:  Are you saying that if they see an officer do something that is wrong, they're going to automatically not indict him or they're going to somehow start thinking what he did was right, even though something is clearly wrong?

A.    No.  I'm not making any comment about indictment.

Q.    Okay.

A.    I'm saying that that's who they would identify with.  That's the eyes that they're seeing it through.  That's who they will identify with.

Q.    Okay.  But you would also agree with me that, as Mr. Ramirez testified to, that that could also -- some of the simulations could be from the perspective of a civilian, such as the bank scene?

A.    I didn't see that.  All I saw was an off-duty police officer.  So, I -- I guess at the time they would have been a citizen.  I'm not sure. I mean, I took it as everybody that was in there was either an on-duty police officer or an off-duty police officer carrying a weapon.

Q.    Okay.

A.    From what I saw.

Q.    And how was it that you're saying that that affects a grand jury's determination just because they stood in the perspective of an officer at one point in time?

A.    I'm saying it will cause -- you're asking me?

Q.    Yes.

A.    I'm saying that it can change the way that they think.

Q.    Okay.

A.    I'm not saying which direction it will change the way they think.  It depends on what they're identifying with at the time.  But it can -- it has the potential, the strong potential, for them going through it, feeling how a police officer feels, thinking what a police officer thinks, to identify with that police officer or off-duty police officer. Or if it is a civilian carrying a weapon, they're identifying with them, and they're not given the chance to identify with anybody else.  They're not given the chance to identify with the person holding the baby or the person holding the rock or the person in the car talking to the female.

Q.     Okay.  But you would agree with me, since you are a forensic expert, that when you are -- when a grand jury is making a determination about whether or not self-defense is appropriately applied, you look at it from the perspective of the actor, not the person holding the baby, not the person holding the rock?

A.     Well, I think you should look at it from all perspectives.

Q.     Well, but you -- as a forensic psychologist, you said that you're aware of how psychology applies to the law, right?

A.     Right.

Q.     I'm telling you that the law says that you look at it from the perspective of a reasonable person in the actor's shoes.

A.     Okay.

Q.     So, given that circumstance, would you -- you would agree with me then that actually the simulator mirrors for the grand jury the exact perspective they should be considering under the law?

A.     Well, I mean, I think that to me that's a legal argument that you guys can make.  What I'm looking at is the potential for bias.  As a psychologist, what I'm looking at is the potential

for bias. And when you're putting somebody -- when you're looking at something through somebody else's eyes, regardless of the outcome, if we're speaking purely about identification, then that is the person that they are going to identify with. As far as if that's who they should be identifying with or not, that's a legal argument for you guys to make.

Q. You would agree with me, Dr. Sweeney, though, wouldn't you, that every one of those grand jurors brings their own set of life experiences and biases to the table with them when they join the grand jury?

A. Yes.

Q. And that any one of those historical biases or motives could influence any grand juror on any given case?

A. Yeah. That's one of the benefits of having a jury of your peers is everyone brings different things to the table. The problem is when you put the same thing in front of all of them. And now you're actually giving them a bias versus the bias that they already bring in on their own.

Q. Well, you would agree with me, though, that if a lawyer provides the law to a grand jury, yes, that everyone across the board is going to have the

same, I guess, education on what that law is?

A.    Yes.

Q.    But that doesn't necessarily lead to a negative bias, correct?

A.    Well, I'm not sure that -- I'm not sure that giving them the law would lead to a bias at all.

Q.    Well, it would further educate them on what the law actually is, correct?

A.    Right.

Q.    Which could lead to a change of perspective or it could lead to a change in the way that a grand juror views the case, correct?

A.    Sure.

Q.    And that's not necessarily a negative thing, correct?

A.    Right.

Q.    In fact, it could just mean that a grand juror is better equipped to handle a particular issue or a question of law, right?

A.    Yes.  I would hope that a grand juror or any juror would be educated on the entire law.

Q.    Okay.

         MS. BYROM:  Your Honor, may I approach the witness?

         THE COURT:  Yes.

Q.    (BY MS. BYROM)   I'm showing you what's been already admitted as State's Exhibit Number 2.   This is a reduced-to-writing copy of the actual slide show.   If you could take just a moment to flip through there.

A.    (Complies.)

You want me to read through it all?

Q.    Just take a look at it, get a sense of it.

A.    (Witness reading.)

Q.    Dr. Sweeney, have you had a chance to review State's Exhibit Number 2?

A.    Yes.

Q.    Where in State's Exhibit Number 2 is there something highlighted that you feel like would lead to an inappropriate bias of a grand jury that would cause them to identify with a peace officer?

A.    Well, some of the things -- I wouldn't say highlighted.   What I would say things that concern me is -- is this all that they're shown?

Q.    This is the slide show.

A.    This is it?   When you look at Section 1.02, I'm concerned that there's only one, four, and five. I don't know where two and three are.   I think that they should be entitled to know everything they're reading instead of just bits and pieces that someone

chooses. So, that, in fact, could possibly lead to them adding more credence to that, thinking more about this, knowing that this came from a district attorney, the person that's guiding them. So, you could put more focus on that.

Q. And let me rephrase my question. Because I don't think that you heard what I said. Where is -- where did you see something in here in State's Exhibit Number 2 that would bias a grand juror to see things from a police officer's point of view?

A. Oh. Oh. Oh. Okay. I see what you're saying.

No. This doesn't speak directly to peace officers, this part of it.

Q. Okay. So, you would, in fact, agree with me, wouldn't you, Dr. Sweeney, that this --

A. Well, you know what? Let me -- I'm sorry. I jumped ahead of myself. I just want to go ahead and look at this one part.

MR. LOONEY: Your Honor, I object to the question and that she's tending to impeach him with information that was provided by Mr. Ramirez and not by him. Mr. Ramirez is the one that said he highlighted sections of the law.

THE COURT: I know, but I'll overrule

the objection.

A.    I do have a couple questions in regard to how this could --

Q.    (BY MS. BYROM)  Well, I guess -- it's not a situation where you can ask questions.  My question to you is:  Do you see anything directly in there that would tend to put somebody in a situation where they are biased towards a peace officer?

A.    Yes.  I'm wondering why -- things that would concern me is Section 9.51(a), they underline certain terms.  I'm not sure why that would be necessary for them to underline --

Q.    So, for example --

A.    That could in turn draw their thoughts to that.

Q.    Right.

A.    More so --

Q.    Then let me stop you right there.  The terms that are highlighted are, "A peace officer can use force --"

A.    Uh-huh.

Q.    "-- when and to the degree he reasonably believes it is immediately necessary."

A.    Okay.  Well --

Q.    How does that tend to put someone in the

position or bias them towards identifying with a police officer?

A.   When you throw "force," "reasonably believes," and "immediately necessary," which are the terms that are highlighted, not the entire thing --

Q.   Okay.

A.   -- when you look at those words, when they go through the simulation, they can be programmed --

Q.   And I'm not talking about the simulation.

A.   Well, it's all related.

Q.   I'm only talking to you right now about the slide.

A.   Okay.

Q.   How does that in and of itself cause a problem?

A.   Okay.  Those three words can cause people to think differently.

Q.   Okay.  So, they may focus --

A.   By underlining those three words rather than the entire thing, that can cause them to put their focus on just that part.

Q.   Which might actually be a good thing, right?

A.   I'm not saying it's not.  It could be.

Q.   So, we don't know that there is anything

inherently negative here --

A.    No.

Q.    -- about the way that things were underlined or italicized or highlighted, correct?

A.    Right.  And there's more to that question to be asking, too, if you want me to keep going or if you want me to stop --

Q.    I think that's enough.  Dr. Sweeney, you also stated earlier that -- and as a matter of fact, you would agree with me that in that slide presentation that you've just reviewed that there is information there that a grand jury could reasonably use in their determination that could actually benefit a defendant who was claiming self-defense, correct?

A.    Sure.

Q.    You stated earlier that you have not looked at any particular statistics relating to the State of Texas versus William Driver or any Harris County cases, correct?

A.    Correct.

Q.    But that you stated that you did review a case called Zimbardo.

A.    It's not a case.  It's a study.

Q.    I'm sorry.  A case study.

A.    Yeah.  It was a social study that was put together for academia.

Q.    And in that study, everyone physically participated for an extended period of time, correct?

A.    Yes.  One person dropped out early due to the psychological affects of it.  Everybody else stayed six days.

Q.    So, it was a sustained level of participation over an extended period of time?

A.    Yes.

Q.    And that it was -- it was made to be a realistic experience 24 hours a day, correct?

A.    24 hours a day for the prisoners, eight hours a day for the guards.  After that the guards were -- they left and were students.

Q.    During that study, were there moments where people stopped to discuss what was happening or what people's opinions were of what was happening in the room?

A.    The prisoners talked to the prisoners.  The guards talked to the guards.  The prisoners asked them why they were doing certain things.

Q.    Okay.  But there wasn't any sort of breakdown where a professor came in the room and said, "What does everyone think about what just

happened?"

A.     No, not until after.

Q.     So, there was no sort of discussion during the process itself?

A.     Not during.

Q.     And regarding what you've talked about with identification, would you agree with me that over time the affects of identification may lessen the more remote they are in time to the experience that caused the identification?

A.     It would depend on the experience, it would depend on the level of emotion that they felt, if they'd experienced anything like that before.  It's hard to say.  It just depends on what the emotional experiences were with the person.

Q.     Well, you would agree with me that a highly-charged emotional sustained experience over a long period of time inevitably will have more of an affect on somebody than a short-term experience of very little emotional affect?

A.     A very little emotional affect?

Q.     Correct.

A.     Yes.

Q.     You also talked about that there was something called "persuasion," correct?

A.   Yes.

Q.   And you would agree with me that our criminal justice system by its very nature relies on persuasion?

A.   Yes.

Q.   And that grand juries, juries alike, at some level persuasion enters into the equation?

A.   Yes.

Q.   And you stated that in particular it's very possible that a grand jury could be persuaded by a prosecutor because they are someone that a grand jury might view as trustworthy, credible, or more persuasive?

A.   In this particular situation, we talked about a prosecutor being persuasive due to the nature of the situation.

Q.   But you would agree with me as a forensic psychologist who's familiar with the concept of a grand jury that inevitably it would be a prosecutor that's providing that information --

A.   Yes.

Q.   -- as opposed to a peace officer or a defense attorney or somebody else?

A.   Yes.

Q.   That there's not really a way around that?

A.    Well, yeah.  You don't present the information that will bias them.

Q.    Well, would you agree with me that inherent in the system that even if people come to the table without meaning to be biased in any sort of way, it's just -- when it's a one-sided presentation, it's just inherent that there's going to be some sort of persuasive affect?

A.    Sure.

Q.    You stated earlier when it came to persuasion that there was a high psychological probability of having gone through a highly altered state.  What do you mean by that?

A.    I -- what I'm saying is that there's a high psychological probability they can be persuaded, that their thinking can change from before they were in that simulator to after.

Q.    But what do you base that on if you haven't done any of the statistics?

A.    I'm basing that on social influence and the studies that have gone on for years and years and years and years and my experience in the field.

Q.    Do you have -- can you cite to any studies that refer to the affect of simulators on the grand juries?

A.    No.

Q.    You stated that there's something called the "group effect" and that in that situation, a group that you are -- that a person is a part of has a social influence on any single member, correct?

A.    Yes.  They can be socially influenced by the group.

Q.    But you would agree with me that the grand jury experience by its very nature involves group and group mentality?

A.    Yeah, definitely.  Yes.

Q.    Regarding cognitive dissonance, you stated that that situation occurs where values, beliefs, and/or behavior don't all match and so that maybe you alter one of those things so that they're in more congruence, correct?

A.    Yes.

Q.    Would you agree with me that it's possible that somebody could have bad values or bad beliefs, go into the simulator, and have their beliefs or values changed in a way that becomes a positive influence?

A.    Sure.

Q.    You stated that out of all of these different psychological concepts that we've

discussed, any or all of them could be at play during the grand jury's deliberation, correct?

A.    Yes.

Q.    Is it also possible that none of them could be at play?

A.    Yeah.  I believe I said that, too.

Q.    In fact, as part of your consulting, you haven't spoken to any of the grand jurors?

A.    No.

Q.    You're not aware of what the grand jury said?

A.    (Shakes head.)

Q.    You're not aware of how many grand jurors actually went to the simulator?

A.    No.

Q.    And while you've stated that you believe the simulator would have an affect on people -- that that was your stated opinion, correct?

A.    Yes.

Q.    You really have no way of knowing to what degree that simulator had an affect?

A.    Not without studies, which I don't believe any have been done.

Q.    You have no way of knowing whether it positively or negatively affected the defendant?

A.    Well, I can't determine -- no.  No.  You wouldn't know -- you wouldn't -- without having the studies on how this actually affects jurors, what we know is that it can have a strong affect.  To say exactly what it is, that information is not out there.

Q.    So, you would agree with me that you don't know in this particular case how it affected the grand jury?

A.    Right.

MS. BYROM:  I'll pass the witness.

THE COURT:  Anything else?

MR. LOONEY:  Yes, sir.

FURTHER REDIRECT EXAMINATION

Q.    (BY MR. LOONEY)  But you do know that in this particular case, State versus William Driver, there is within a reasonable psychological probability a very real influence upon the grand jury by virtue of having gone through the process that we've been talking about here today?

A.    Yes.

Q.    And if he happened to have a grand jury that was made up of nothing but outliers and none of them were influenced by this process that we have today, that that would be a statistical

improbability?

A.    Yes.

Q.    Now, just so that we can clear up a couple of things, when you're talking about -- counsel was talking to you about identification could come from a lot of things, it could come from every life experience you've had.  That's true, right?

A.    True.

Q.    That's random.

A.    Right.

Q.    That's not controlled?

A.    Right.

Q.    That's not contrived?

A.    True.

Q.    That's a cross-section of our community?

A.    True.

Q.    Identification that comes from a process that has been designed and is optionally applied to humans, that's a very different thing, isn't it?

A.    Yes.

Q.    In fact, that makes it to where those very people that have gone through this process are no longer a cross-section of our society on these people within a reason --

MS. BYROM:  Objection.  Argumentative

and leading.

THE COURT: Well, it's also repetitious. These are questions that he asked earlier.

Sustained on that ground. On my ground, not yours.

Q. (BY MR. LOONEY) And when counsel was talking about persuasion as a natural part of the legal process, persuasion that comes from the interaction of the cross-section of the community is qualitatively different than persuasion that is happening through subtle processes that are being intentionally applied to the whole group; isn't that correct?

A. Yes.

Q. What she was talking about is the interplay of intelligent cross-section of our community, right, in the argument process?

A. I'm not really sure of that. I can't tell you what she was talking about.

Q. All right. Now, also on the issue of persuasion, persuasion as you've been using the term is not the same thing as making good, high quality, well-reasoned arguments?

A. Right.

Q.    That's not what you've been talking about?

A.    No.  I'm talking about social influence.

Q.    You're talking about things that subtly but very real change, alter, and impact the way we view situations and make decisions?

A.    Yes.

Q.    Persuasion through high quality arguments is not manipulative, right?

A.    I mean, it can be; but that's not -- that's not what it's shooting for.

Q.    The persuasion that you've been talking about as an element of all of this is a highly manipulative thing; is that fair to say?

A.    Well, I think what's fair to say is if they meant to do it, it's manipulative.  If it just happened and they didn't realize it was happening, I don't know that I would consider it manipulative.  But it still has the probability of being persuasive.

Q.    Let me ask you something.  If it's having that manipulation result, why is it unfair to call the process manipulative, even if it's unintended and unintentional and maybe even unknown?  It's still manipulative, isn't it?

A.    I would say again that's a legal argument for you guys to make.

Q.    All right.  Okay.

MR. LOONEY:  I pass the witness, your Honor.

THE COURT:  Anything else?

MS. BYROM:  Just briefly, your Honor.

FURTHER RECROSS-EXAMINATION

Q.    (BY MS. BYROM)  Dr. Sweeney, without going into the substance of any conversations that you might have had as a consultant with defense counsel, is it fair to say that today's not the first time you've spoken to them?

A.    I'm sorry.  Say that again.

Q.    Is it fair to say that today is not the first time you and Mr. Looney or you and Mr. Conrad have spoken with each other?

A.    I spoke very briefly with them.

Q.    And they were able to provide you some information?

A.    They forwarded me the discovery and asked me to look at it and see what I thought.

Q.    Absolutely.  Okay.  And you had a brief conversation with them?

A.    Yes.

Q.    And, in fact, they're the ones footing your bill, right?

A.    Yes.

Q.    Is it fair to say that there may be things such as persuasion or identification from the defense's standpoint that may be having an influence on you?

A.    I think it's always fair to say that about anybody; but in this particular case as a professional --

Q.    Is it possible?

A.    -- you know, I'm aware that that's not going to be a situation.  At no point have I ever testified to something because somebody wants me to.

Q.    No.  And that's not what I'm saying.  But I guess what I'm trying to get at is:  Is it possible because of the frame of reference you're coming from that maybe that could even influence your opinion?

A.    Like I said, I think that's always possible with everybody.

MS. BYROM:  I'll pass the witness.

THE COURT:  Anything else?

FURTHER REDIRECT EXAMINATION

Q.    (BY MR. LOONEY)  Dr. Sweeney, in summary, because of all of the reasons that you have testified to, is it your opinion within a reasonable psychological probability that after going through